**FRIENDS OF THE BOUNDARY WATERS WILDERNESS, et al., Plaintiffs,**

v.

**F. Dale ROBERTSON, et al., Defendants,**

and

**City of Ely, et al., Intervenors-Defendants.**

Civ. No. 4–90–8.

United States District Court, D. Minnesota, Fourth Division.

Aug. 1, 1991.

Richard A. Duncan, Brian B. O'Neill, Andrea M. Fike, Faegre & Benson, Minneapolis, for plaintiffs.

Allan D. Brock, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., and Robert M. Small, Asst. U.S. Atty., Minneapolis, Minn., for defendants Robertson and Madigan.

Kent Robert Holmberg, Defenbaugh Law Offices, Ely, Minn., for intervenors City of Ely and Conservationists with Common Sense, Inc.

Bennett A. Webster, Gamble & Davis, Des Moines, Iowa, and James C. Ohly, Doherty, Rumble & Butler, Minneapolis, Minn., for intervenors Wilderness Outfitters, Inc., and Hubachek.

## ORDER

ROSENBAUM, District Judge.

How to protect; how to preserve; how to access wilderness? What and whose values are embodied in the concept of wilderness?

This matter is before the Court on cross motions for partial summary judgment. The immediate issue is whether there is an alternative to motorized portages at three locations in the Boundary Waters Canoe Area Wilderness (Boundary Waters or BWCAW). The parties agree that this portion of the action is ripe for summary judgment.[1] The Court concurs in this view.

Plaintiffs bring this action for declaratory and injunctive relief and for judicial review of final agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 701, et seq. Jurisdiction is properly based upon 28 U.S.C. §§ 1331, 1361, and 2201.

By this motion, plaintiffs seek two forms of relief. They first request a declaration that defendants have acted illegally in allowing the continued operation of three motorized portages in the BWCAW and in permitting the existence of permanent structures within the BWCAW. Second, plaintiffs seek a permanent injunction barring the continued operation of those motorized portages and directing defendants to ensure elimination of permanent structures from the BWCAW. Plaintiffs also seek attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

The plaintiffs are non-profit organizations which claim an interest in protecting, preserving, and enjoying the nation's wilderness areas, and the Boundary Waters in particular. The BWCAW, established in 1978, is a wilderness area of more than one million acres within the larger Superior National Forest in northern Minnesota.

Defendant F. Dale Robertson is the Chief of the United States Forest Service (Chief) and defendant Edward Madigan is the Secretary of Agriculture (Secretary).[2] Defendants are responsible for formulating and implementing management plans for the Superior National Forest. Intervenors City of Ely, Conservationists with Common Sense, Inc., Wilderness Outfitters, Inc., and F.B. Hubachek, Jr., were granted leave to intervene and defend against plaintiffs' claims concerning the motorized portages.[3]

*Background and the "Nonfeasibility" Decision*

The Wilderness Act, 16 U.S.C. § 1131, et seq., requires that protected areas be administered to maintain their wilderness character for future use and enjoyment. The Boundary Waters Canoe Area Wilderness Act of 1978 (BWCAW Act), Pub.L.No. 95–495, 92 Stat. 1649, designates the Boundary Waters as a wilderness to be administered in accordance with the Wilderness Act. Of particular interest here, the BWCAW Act directs the closure of the motorized portages from Sucker Lake to Basswood Lake (Prairie Portage), from Fall Lake to Basswood Lake (Four Mile Portage), and from Lake Vermilion to Trout Lake (Trout Lake Portage) after January 1, 1984, unless the Secretary determines that

---

**1.** A companion portion of this suit has been temporarily resolved and is not germane to this motion.

**2.** Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Edward Madigan is substituted for Clayton Yeutter.

**3.** Wilderness Outfitters, Inc., operates Four Mile Portage. F.B. Hubachek, Jr., is chairman of The Wilderness Research Foundation.

no feasible non-motorized means existed to transport boats between the involved lakes. BWCAW Act § 4(g).

Minnesota's vast northeastern "forest-lakeland wilderness ecosystem" was formed by the timeless actions of nature during ages immemorial. *Id.* § 1. The BWCAW, on the other hand, was formed by the United States Congress in the crucible of the 1978 political season. The laws of nature shaped the wilderness; the lawmaking of Congress shaped the BWCAW.

The BWCAW is situated in northeastern Minnesota, along the United States/Canadian border. It consists of some 1,075,500 acres of nearly virgin lakes, waterways, and forested areas. *Id.* § 3. Over one thousand lakes lie within its borders. The use of motorboats is prohibited on all but a few of these lakes. *Id.* § 4(c)(1)–(4). Motorboats are permitted on the five lakes served by the portages at issue here. The BWCAW Act not only restricts the use of motorboats, it almost completely bars mechanized portages. *Id.* § 4(i). The Act, however, specifically reserves for future consideration the use of motor vehicles to transport watercraft over the portages from Sucker Lake to Basswood Lake, from Fall Lake to Basswood Lake, and from Lake Vermilion to Trout Lake, after January 1, 1984.[4] *Id.* § 4(g). As to these particular portages, the BWCAW Act provides that:

> Nothing in this Act shall be deemed to require the termination of the existing operation of motor vehicles to assist in the transport of boats across the portages from Sucker Lake to Basswood Lake, from Fall Lake to Basswood Lake, and from Lake Vermilion to Trout Lake, during the period ending January 1, 1984. Following said date, *unless the Secretary determines that there is no feasible nonmotorized means of transport-*
> *ing boats across the portages to reach the lakes previously served by the portages listed above, he shall terminate all such motorized use of each portage listed above.*

*Id.* (emphasis supplied). It is the emphasized portion of § 4(g) which underlies this action.

In compliance with § 4(g)'s mandate, the Forest Service considered the feasibility of using portage wheels as an alternative to motorized portages.[5] Personnel from the Forest Service tried to cross the one-half mile Prairie Portage with a loaded motorboat on portage wheels. They were unsuccessful in their attempt. Admin.Rec.Item 1 (app. F).

Based upon a memorandum documenting the unsuccessful Prairie Portage attempt, the Forest Service, on behalf of the Secretary, determined that there was no feasible nonmotorized means of transporting boats across the portages listed in § 4(g). Admin.Rec.Item 1. As a result, the Forest Service determined that the motorized portages were to be maintained. This conclusion was then incorporated into the land and resource management plan for the Superior National Forest.[6] Admin.Rec.Item 3. The plan was approved by the Regional Forester on June 6, 1986. Admin.Rec.Item 4.

Plaintiffs filed their administrative appeal of the plan on June 26, 1986, challenging, inter alia, the decision to continue motorized portages. Admin.Rec.Item 5. As part of their statement of reasons, dated August 27, 1986, appellants submitted a videotape which showed that three of their members had successfully traversed each of the three portages by means of portage wheels. Admin.Rec.Items 38, 38(a).

Following a December, 1987, hearing, the Chief issued a further decision concerning motorized transport across the portages.

---

**4.** Section 4(d) of the BWCAW Act specifically authorizes motorized portages at the Beatty Portage and the Loon Falls Portage sites.

**5.** Portage wheels consist of an axle system and two wheels, which may be strapped to a boat. This device is usually situated approximately two thirds to three quarters of the distance from the prow. If properly placed, the boat will nearly balance and may be steered and pushed by hand.

**6.** Such management plans are mandated under the National Forest Management Act, 16 U.S.C. § 1604.

In this decision letter, dated March 10, 1989, the Chief's office determined that the "no feasibility" finding must be revisited. Admin.Rec.Item 320. The decision directed that the Regional Forester immediately halt motorized portages at the Four Mile and Trout Lake sites. The Regional Forester was instructed to conduct further studies to determine the feasibility of using nonmotorized means to traverse the three portages. *Id.* According to the plaintiffs, this instruction prompted a contact from the office of Representative Oberstar (D–Minn.), who represents the district encompassing the BWCAW. Plaintiffs assert that the congressman called in protest of the portage closures. Plaintiffs' Memorandum in Support of Partial Summary Judgment Re: Motorized Portages, 11–13 (Dec. 20, 1990). *See also* Amended Complaint ¶ 25. Presumably based, at least partially, on this input, on April 20, 1989, the Chief deferred the March 10, 1989, closure decision and ordered that the two motorized portages remain open pending completion of the portage study. Admin.Rec.Item 327.

Thereafter, in July and September, 1989, Forest Service personnel were organized into one, two, and three person portage teams of both genders and various ages. These teams, using boats and loads of differing weights, conducted another study of the feasibility of portage wheels as an alternative to motorized transport at the Prairie, Four Mile, and Trout Lake portages. Admin.Rec.Item 346.

After receiving the resulting portage report, the Chief issued his decision, dated October 11, 1989, determining that "nonmo-torized means of transporting boats [at these sites] ... are not feasible. Motorized portages in these locations therefore need not terminate."[7] Admin.Rec.Item 347. This determination of nonfeasibility constitutes final agency action on the administrative claims with regard to the portage issue and is the decision which is challenged in this case.

*The Parties' Positions*

Plaintiffs argue that the Chief's decision constitutes agency action "not in accordance with law" and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The plaintiffs advance three arguments. Plaintiffs first claim that the defendants' failure to end motorized use of the three portages violates the BWCAW Act. Premised on their view of Supreme Court precedent and the legislative history of the BWCAW Act, plaintiffs claim that "feasible" means "possible." They then assert that there exists a feasible nonmotorized means of transport—the use of portage wheels. It is the plaintiffs' position that portage wheels satisfy the § 4(g) requirement and mandate the elimination of mechanized portages at all three sites. Plaintiffs next argue that the Chief's decision violates the Wilderness Act. They argue that the use of trucks to haul boats between lakes in a designated wilderness is inconsistent with three specific sections of the Wilderness Act. Plaintiffs' third argument is that the Chief's failure to end the use of these motorized portages violates his duties as a public trustee of a wilderness area. In their view, the Chief's decision violates the obligation delegated to

7. In these tests, approximately 76% of the nonmotorized portages were successful. Admin.Rec.Item 346. This fact alone, however, did not dispose of the issue in the Chief's view. The Chief found dispositive the results of a companion study conducted by physiologists showing that physical danger existed for those attempting non-motorized portages. Admin.Rec.Item 347.

As part of the portage tests, three physiologists fitted individuals with devices to monitor heart rate and blood pressure during the portages in order to quantify the physical effort required. The same subjects were later given treadmill tests at St. Mary's Medical Center in Duluth, Minnesota, to assess their level of physi-cal fitness. The physiologists then compared the physical fitness of the team members to that of the general population. The physiologists' report concluded that the test subjects were in excellent physical condition, that portaging manually with portage wheels required high levels of sustained physical effort, and that people of "average" physical ability could not use portage wheels without undue physical stress. Admin.Rec.Item 346 (app. G).

The Chief determined that "in view of medical risks," it was not feasible to portage the routes by other than motorized means because the effort required was too great for a finding of feasibility. Admin.Rec.Item 346.

him by Congress to manage the Boundary Waters with a presumption in favor of wilderness values.

Underlying each of plaintiffs' arguments is the explicit allegation that the studies and investigations relied upon by the Chief do not support his finding of nonfeasibility. There is also a sub-chord suggesting that the decision to maintain motorized portages resulted from impermissible political pressure.

In reply, the defendants and intervenors argue in support of the Chief's decision and urge this Court to defer to the administrative finding of nonfeasibility. Defendants, joined by the intervenors, contend that the BWCAW Act leaves this decision to the Chief of the Forest Service.

Specifically, the defendants and intervenors argue that the Chief's decision, incorporating considerations of health and safety into the definition of "feasible," is a permissible and rational reading of the statutory term. It is their position that this reading is consistent with the legislative history of § 4(g), the ordinary use of the word, and the administrative record. Intervenors Wilderness Outfitters and Hubachek add that motorized portages increase access to the wilderness, urge that motorized passage on the Four Mile Portage is a wilderness experience, and contend that closing Four Mile Portage to motorized passage may actually diminish wilderness values by increasing reliance on other portages. Intervenors City of Ely and Conservationists with Common Sense have submitted affidavits from various individuals setting forth their belief that portage wheels are not feasible.

*Analysis*

Under the APA, this Court, in reviewing final agency action, must "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or other-

wise not in accordance with law...." 5 U.S.C. § 706(2)(A). In conducting its review, the Court

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (citations omitted). This review must be based on the record already in existence and not on some record made initially in the reviewing court. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

The administrative record before this Court consists of some 350 items and numbers thousands of pages. The material ranges from letters and private observations to over eighteen hours of videotape footage of successful—and unsuccessful—portage wheel attempts. On reviewing the record, including videotapes, the Court finds that, with the expenditure of substantial effort, a group of healthy, able-bodied individuals can, using muscle power and portage wheels, traverse each portage.[8] The record further demonstrates that such a group, at the height of exertion, cannot always accomplish the task.

The record unequivocally shows that portaging takes much longer under muscle power than when mechanized. Finally, the Court has no difficulty making two additional observations. First, a motorized portage is louder than even the most exhausting muscle powered portage. Second, a bar to motorized portages would significantly diminish the number of motor-pow-

---

8. The Court notes that issues of access for disabled persons are not raised by either the Wilderness Act or the BWCAW Act and were not developed in the administrative record. *But see, e.g.,* Admin.Rec.Items 47, 49, 71, 73, 77, 78, 79, 83, 95, 97, 98, 102, 103, 115, 133, 134, 142, 144, 157, 159, 160, 161, 164, 166, 167, 168, 173, 175, 177, 178, 181, 188, 250, and 287 (letters expressing the view that elimination of the motorized portages would result in lack of access for disabled persons). Such questions may well arise in other circumstances or under other statutes. *See, e.g.,* Americans with Disabilities Act of 1990, 42 U.S.C. § 12207.

ered boats on these five destination lakes.[9]

These conclusions, however, do not answer the immediate question before the Court: Is it feasible to transport boats to the lakes served by these portages using nonmotorized portage wheels? This case ultimately turns on the meaning of "feasible" as used in the BWCAW Act. Plaintiffs contend that "feasible" means "possible" or, perhaps, "conceivable." Defendants and intervenors suggest a meaning closer to "convenient," "practicable," or "reasonable."

The word feasible was used, albeit in a slightly different context, in the environmental protection statutes considered by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). That case involved a challenge to the authorization of federal funds to finance the construction of an interstate highway through a city park in Memphis, Tennessee. Under the Department of Transportation Act, 23 U.S.C. § 138, and the Federal–Aid Highway Act, 49 U.S. C. § 1653(f), parkland could not be claimed for a highway unless the Secretary of Transportation determined that "there is no feasible and prudent alternative to the use of such land." The court found the statutory language "plain and explicit," barring the use of federal funds for highway construction through parks, except in "the most unusual situations." *Id.* at 411, 91 S.Ct. at 821. For the feasibility exemption to apply, the court determined that "the Secretary must find that *as a matter of sound engineering* it would not be feasible to build the highway along any' other route." *Id.* (emphasis added, footnote omitted).

Certainly a highway engineering case is not the direct analogue to that before the Court. A review of the *Overton Park* definition of "feasible" makes it clear that the Supreme Court considered the term within the context of the specific case, as opposed to adopting a dictionary or textbook definition. In *Overton Park*, a highway/parkland dispute, the Court balanced questions of "sound engineering" and preservation of the integrity of the park to arrive at the meaning of "feasible."

This Court, then, finds that it must consider feasibility within the context of a wilderness. Congress provided a definition of "wilderness" in the Wilderness Act:

A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this Act an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of such sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

These words bespeak a lofty goal. But the words express an aspiration, they do not designate a path. And the words ring hollow if this carefully protected wilderness is without human appreciators. Congress has not cast the Boundary Waters

---

**9.** As discussed above, motorboats are permitted on Sucker Lake, Basswood Lake, Fall Lake, Lake Vermilion, and Trout Lake, the lakes served by the portages at issue. By way of illustration, the Four Mile Portage (between Fall Lake and Basswood Lake) is approximately four miles long and nearly level. Nevertheless, the round trip portage took between three hours and 18 minutes and five hours and 22 minutes. Admin.Rec.Item 346. This means that a one-day fishing trip, if it includes a two hour portage to the lake, fishing, and the return two hour portage, is impractical. This situation certainly would diminish one-day lake use and consequent motor sounds from a one-day trip.

Canoe Area Wilderness in aspic or proscribed its public use. Instead, the BWCAW Act, itself, seeks to balance protection of wilderness with public access to that wilderness. What does "feasible" mean in this context?

As a preliminary matter, the Court is confident that it does not mean an absolute, unqualified denial of motorized access. In drafting the statute, Congress clearly knew how to bar mechanization in the wilderness. As discussed above, save for the portages at issue in this case, and two others, motorized portages in the Boundary Waters are explicitly banned in the BWCAW Act.[10] Congress focused directly on these three portages and determined that it was proper to keep them open, subject to reexamination after January 1, 1984. As evidenced by the portage study, the administrative appeal, and this lawsuit, the Congressional mandate has been observed; the matter of motorized portages has been closely scrutinized.

As a secondary matter, the Court observes that the question of mechanized portages is emotionally, politically, and economically charged. All participants seek what they view as the best for the public at large and for the wilderness. No expressed position is wrong, but the positions certainly differ. For some, any motorized intrusion diminishes their wilderness experience. For others, motorized access increases wilderness appreciation. Others have a financial stake in continued motorized access. Some are simply incapable of accomplishing a nonmotorized portage. There are still others, even the most hale, whose view of wilderness enjoyment encompasses a day-trip and then a return to civilization's hurly-burly. Each views the Boundary Waters through a single facet of the prism. And many views, as opposed to any single view, were considered when Congress, as the political body which accommodates compromise, created the BWCAW.

It is in this respect that the Court rejects the plaintiffs' suggestion that political influence is illegitimate. Politics, understood as the combat of competing interests held by members of the body politic, was integral in the founding of the BWCAW and continues to be so. It is in the legislative and administrative processes that competing interests are weighed and balanced.

The legislative history on the issue of motorized portages makes this clear. The House and Senate versions of what eventually became the BWCAW Act differed significantly. The House bill, H.R. 12250, 95th Cong., 2d Sess. (1978), sponsored by Representative Burton (D–Calif.), would have terminated all five mechanized portages which were operating in the Boundary Waters in 1978. The Senate version, S. 3242, 95th Cong., 2d Sess., 124 Cong.Rec. 18, 744–47 (1978), sponsored by Senator Anderson (D–Minn.), on the other hand, would have permitted continued operation of the existing portages. During deliberation on the Senate bill, the Senate Committee sought a compromise from the proponents and opponents of the continued use of motorized portages. 124 Cong.Rec. 34,-851 (1978). The resulting compromise, known as the "Dayton–Walls compromise," was encompassed in §§ 4(d) and 4(g) of the BWCAW Act.

Plaintiffs claim that the legislative history reflects an understanding that "feasible" meant "possible." They base this argument on the eight-years-after-the-fact statement of Attorney Charles Dayton (the Dayton in "Dayton–Walls), made August 17, 1986. Mr. Dayton avers that he and Walls, years before, understood "feasible" to mean "a motorboat would be capable of being transported by three able-bodied adults between the lakes in question...." Admin.Rec.Item 38 (app. Vol. I at 80–81). Plaintiffs further rely on statements made on the House floor by Representative Burton. 124 Cong.Rec. 38,514–15 (1978). Plaintiffs maintain that Representative Burton's interpretation of the meaning of feasible is on a par with the conference committee report itself.

Defendants counter by showing that "feasible" was simply the word used to

---

10. BWCAW Act §§ 4(d), (g), (i).

temporarily resolve the issue. In their view, that same legislative history supports an interpretation of "feasible" which includes considerations of the health and safety of the persons using the portages. In their view, Mr. Dayton's personal understandings are not part of the legislative history, and Representative Burton's remarks are entitled to no weight whatsoever.

This Court finds that the legislative history of the BWCAW Act reflects the same competing interests arrayed in this proceeding. Senator Anderson's draft bill suggested an interest in continued easy public accessibility. Representative Burton's version evidenced an interest in a complete ban on motorized routes. Neither version was adopted and the result was a compromise. As to these specific portages, Congress delayed and delegated the final decision to the Forest Service. Now, some thirteen years later, this Court is asked to review such a decision.

This Court finds that the Chief's October 11, 1989, decision, finding that there is no feasible alternative to motorized portaging, was neither arbitrary, capricious, nor an abuse of discretion. The Court further finds that his decision was not contrary to law. In this regard, the Court finds that the term feasible was properly considered and applied within its statutory context. As detailed above, "feasible" had to mean something more than either a prohibition or mere conceivability. In *Overton Park*, the Supreme Court focused on a "matter of sound engineering." Here the Chief, and this Court, must focus on matters of human capabilities in conjunction with citizen access to a managed wilderness. When viewed in this light, the Court concludes that the Chief's decision is in accord with the BWCAW Act, the Wilderness Act, and prudent wilderness management.

The Court rejects plaintiffs' view that "feasible" means "possible." On the most trivial level, had Congress meant for motorized portages to be halted if any other method were possible, Congress could have so legislated. The statute employs a different term. More fundamentally, "feasi-

ble," as used in the context of a wilderness which is to be available to the general citizenry—some of whom seek a pristine experience and some of whom seek one less pristine and more accessible—is more properly thought of as "reasonably convenient or usable."

On this basis, the Court finds that the Chief's definition of the term feasible is a permissible construction of the BWCAW Act. The Act's express delegation of the determination to the agency is best harmonized with the goals of the Wilderness Act by interpreting "feasible" to permit the continued operation of the motorized portages at Prairie Portage, Four Mile Portage, and Trout Lake Portage.

Based upon the files, records, and proceedings herein, IT IS ORDERED that:

1. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Edward Madigan is substituted for defendant Clayton Yeutter.

2. Defendants' and intervenor-defendants' motions for summary judgment on Count I of the amended complaint and that part of Count III of the amended complaint relating to motorized transport across the Four Mile, Prairie, and Trout Lake Portages in the Boundary Waters Canoe Area Wilderness are granted.

3. Plaintiffs' motion for summary judgment on Count I of the amended complaint and that part of Count III of the amended complaint relating to motorized transport across the Four Mile, Prairie, and Trout Lake Portages in the Boundary Waters Canoe Area Wilderness is denied.

4. Plaintiffs' request for attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, is denied.

5. Pursuant to Rule 54(b), Federal Rules of Civil Procedure, the Court finds no just reason to delay entry of final judgment on Count I of the amended complaint and that part of Count III of the amended complaint relating to motorized transport across the Four Mile, Prairie, and Trout Lake Portages in the Boundary Waters Canoe Area Wilderness.

LET JUDGMENT BE ENTERED AC-
CORDINGLY.