978 F.2d 1484
 23 Envtl. L. Rep. 20,518
 FRIENDS OF THE BOUNDARY WATERS WILDERNESS; Sierra Club;
The Wilderness Society; Defenders of Wildlife; Wilderness
Watch; Wilderness Inquiry; Minnesota Public Interest
Research Group; Izaak Walton League of America, Inc., Appellants,
v.
F. Dale ROBERTSON, Chief of the United States Forest
Service; Edward Madigan, Secretary of
Agriculture, Appellees,
City of Ely, a Minnesota corporation; Conservationist With
Common Sense, Inc., a Minnesota not-for-profit
corporation; F.B. Hubachek, Jr.;
Wilderness Outfitters, Inc.,
Intervenors-Appellees.
 No. 91-3032.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 13, 1992.
Decided Nov. 6, 1992.
Rehearing and Rehearing En Banc
Denied Jan. 26, 1993.
 
 Brian B. O'Neill, Minneapolis, Minn., argued (Richard Duncan and Sandi Zellmar, on the brief), for appellants.
 Peter A. Appell, Dept. of Justice, Washington D.C., argued (Robert Klarquist, Dept. of Justice, Washington D.C., Robert Small, Asst. U.S. Atty., Minneapolis, Minn., on the brief), for appellees.
 Before McMILLIAN, JOHN R. GIBSON, and MAGILL, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Whether there should be motorized portages in the Boundary Waters Canoe Area Wilderness is the issue before us in this case. The district court refused to enjoin the motorized portages, and the Friends of Boundary Waters Wilderness and seven other groups[1] appeal. The central issue in the appeal boils down to the interpretation of the word "feasible" contained in Section 4(g) in the Boundary Waters Canoe Area Wilderness Act, Pub.L. No. 95-495, 92 Stat. 1649 (1978). The district court upheld the Chief of the United States Forest Service's decision allowing the motorized transportation of boats across the portages because no feasible alternative existed, 770 F.Supp. 1385. We are convinced the district court erred in its interpretation of the statute, particularly, the word "feasible," and we reverse.
 
 
 2
 The Boundary Waters Canoe Area Wilderness, in northeastern Minnesota, consists of some 1,075,500 acres of streams, lakes, and forests.[2] This case involves three portages in the Boundary Waters Canoe Area Wilderness: Prairie Portage, Four Mile Portage, and Trout Lake Portage. For some time, trucks have been used to carry boats across the portages. The Boundary Waters Canoe Wilderness Area Act, however, limits the continuation of this practice. Section 4(g) of the Act provides:
 
 
 3
 Nothing in this Act shall be deemed to require the termination of the existing operation of motor vehicles to assist in the transport of boats across the [Prairie Portage, Four Mile Portage, and Trout Lake Portage] during the period ending January 1, 1984. Following said date, unless the Secretary determines that there is no feasible nonmotorized means of transporting boats across the portages to reach the lakes previously served by the portages listed above, he shall terminate all such motorized use of each portage listed above.
 
 
 4
 The Secretary did not close the motorized portages in 1984. In 1986, the local Forest Service staff completed a Land Resource Management Plan for the Superior National Forest (the Boundary Waters Canoe Area lies wholly within the Superior National Forest). See 16 U.S.C. § 1604 (1988). The Plan authorized the continued motorized operation of the Prairie, Trout Lake, and Four Mile portages. The Plan concluded that these three portages should remain open because it was not feasible to use nonmotorized portage wheels to cross the portages. The Forest Service based this conclusion on a 1981 test in which three men unsuccessfully attempted to cross Prairie Portage using portage wheels.
 
 
 5
 The Friends administratively appealed the decision to continue to allow motorized portages. The Friends submitted a videotape and pictures showing three men traversing all three of the portages at issue using portage wheels.
 
 
 6
 On March 10, 1989, the Chief of the Forest Service issued his decision on the administrative appeal. He observed that the Regional Forester's 1981 study determined only that it was not feasible to use nonmotorized means to cross the Prairie Portage, and that no finding was made about the Four Mile or Trout Lake portages. The Chief concluded that "feasible" means "possible," not "ideal" or "most practical." The Chief directed the closing of the Four Mile and Trout Lake portages and ordered a study to test the feasibility of nonmotorized portaging for the Four Mile, Trout, and Prairie portages. The Chief observed that "[i]f a determination is made that it is feasible to use nonmotorized means to cross a portage, that portage must be closed."
 
 
 7
 Six days later, however, the Chief issued a memorandum delaying the closure of the portages pending the feasibility study. The Friends claim that this change of mind was due to a telephone call from Representative Jim Oberstar. The Chief admitted that Oberstar telephoned and informed him that his constituents were unhappy with the Forest Service's decision, but claims that Oberstar did not ask him to change his ultimate decision on the issue--only to discuss his concerns with the interested parties.
 
 
 8
 In July and September 1989, the Forest Service conducted a feasibility study considering nonmotorized portaging. The Forest Service organized one, two, and three person teams of various ages and genders, using fishing boats with equipment loads of different weights. The field testers successfully completed twenty-six out of thirty-four attempts, and most all of the three-person teams successfully completed the portages.
 
 
 9
 After considering the test results, the Chief determined that although portaging by nonmotorized means "[could] be done ... the task [was] not feasible." The Chief concluded that "the risk to health and safety of portagers should be taken into account in determining 'feasibility.' " Relying on a study performed by three physiologists who concluded that it was physically dangerous for persons to attempt nonmotorized portages, the Chief concluded that it was not "feasible" to attempt nonmotorized portages. Accordingly, the Chief ruled that all three motorized portages should remain open indefinitely. The district court affirmed the Chief's decision, and this appeal followed.
 
 I.
 
 10
 The Friends argue that the Chief's decision leaving open the three motorized portages constitutes agency action "not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). They contend that the Chief's decision violates the Boundary Waters Canoe Area Wilderness Act and the Wilderness Act, 16 U.S.C. §§ 1131-1136 (1988). They argue that as a matter of law, "feasible" means "possible" and, therefore, the district court erred in failing to enjoin this violation of law.
 
 
 11
 The Supreme Court set forth our standard for reviewing agency action in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We must first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781. If the statute is silent or ambiguous, we may only review the agency's action to determine whether that action "is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782. This court recently set forth the inquiry required by Chevron, in Emerson v. Steffen, 959 F.2d 119, 121 (8th Cir.1992).
 
 
 12
 Both parties suggest that the statute is unambiguous, and that the intent of Congress was clear. On the one hand, the Friends say that Congress intended "feasible" to mean "possible," and the Chief violated Congress' express intent by closing the motorized portages in light of the test results. The Chief and intervenors[3] respond that Congress intended that "feasible" meant "reasonable," "practicable" or "likely," and that the Chief, therefore, complied with the expressed intent of Congress in continuing to allow motorized portaging. Their fall-back position is that to the extent that the statute is ambiguous the Chief's decision is based on a "permissible construction" of the Act, which is not arbitrary, capricious, or contrary to law, and therefore, must be upheld. 5 U.S.C. § 706(2)(A).
 
 
 13
 The Friends say that the Boundary Waters Canoe Area Wilderness Act, legislative history of the Act, Supreme Court precedent, and agency precedent conclusively establish that "feasible" means "physically possible." For support, the Friends direct us to the Supreme Court's decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In that case, the Supreme Court considered language contained in the Department of Transportation Act and Federal-Aid Highway Act which directed the Secretary not to " 'approve any program or project' [which] requires the use of any public parkland 'unless (1) there is no feasible and prudent alternative to the use of such land....' " Id. at 411, 91 S.Ct. at 821 (citations omitted). The Supreme Court observed "the requirement that there be no 'feasible' alternative route admits of little administrative discretion. For this exemption to apply the Secretary must find that as a matter of sound engineering it would not be feasible to build the highway along any other route." Id. (footnote omitted).
 
 
 14
 The Chief and intervenors contend that "feasible" does not mean "physically possible," and that Citizens to Preserve Overton Park, is not on point. Pointing to Webster's Third New International Dictionary, 831 (3d ed.1967), they argue that feasible means "reasonably possible" or "practicable," and that it is not "reasonably possible" or "practicable" to push a 16 foot, 25 horsepower boat and gear across the portages.
 
 
 15
 In considering the definition of "feasible," we observe the purposes behind the Boundary Waters Canoe Area Wilderness and the Wilderness Acts. The Boundary Waters Canoe Area Wilderness Act includes as its purposes that of preventing: "further road and commercial development and restor[ing] natural conditions to existing temporary roads in the wilderness." BWCAWA § 2(5). Although some motorboats are allowed on the lakes in issue, it is evident that congressional intent was to discourage motorized uses.
 
 The Wilderness Act defines "wilderness":
 
 16
 A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.
 
 
 17
 16 U.S.C. § 1131(c).
 
 
 18
 Prohibiting motorized portages, unless it is not "physically possible" to do so, is entirely consistent with the purposes announced in these Acts, and we are persuaded that the Chief's definition of "feasible" was overly restrictive and contrary to clear congressional intent and the plain meaning of the word "feasible". Chevron, 467 U.S. at 843, n. 9, 104 S.Ct. at 2782, n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").
 
 
 19
 In addition to the definition of feasible set forth in Citizens to Preserve Overton Park, the Supreme Court defined "feasible" in American Textile Manufacturers Institute, Inc., v. Donovan, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). In Donovan, the Supreme Court addressed the definition of "feasible" in Section 6(b)(5) of the Occupational Safety and Health Act, 29 U.S.C. § 655(b)(5) (1982). 452 U.S. at 508, 101 S.Ct. at 2490. The Court rejected the argument that a determination of "feasibility" required a cost-benefit analysis, and concluded that feasible meant " 'capable of being done, executed, or effected.' " Id. at 508-09, 101 S.Ct. at 2490 (quoting Webster's Third New International Dictionary of the English Language 831 (1976)). Accord Asarco, Inc. v. Occupational Safety & Health Admin., 746 F.2d 483, 495-96 (9th Cir.1984).
 
 
 20
 We think it evident that "Congress has directly spoken to the precise question" at issue. Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. Section 4(g) requires termination of motorized use of the portages unless the Secretary determines that there is no feasible motorized means of transporting boats across the portages. The feasibility test is simply an exception to a clearly expressed mandate. As discussed above, the Supreme Court has considered the definition of the word "feasible" on two occasions. The addition of the term "sound engineering," incorporated in Citizens to Preserve Overton Park does not redefine "feasible" to include "reasonably possible." Indeed, the word "prudent" in the statute in Citizens to Preserve Overton Park, 401 U.S. at 411, 91 S.Ct. at 821, gave the agency substantially more leeway than the Forest Service had under section 4(g). Nevertheless, the Supreme Court concluded in that case that the agency had "little administrative discretion." Id. Thus, in light of the test results, the Forest Service had even less administrative discretion than the agency did in Citizens to Preserve Overton Park. The Chief's decision, as effectuated by the district court's ruling, as well as the dissent, reads into the statute an ambiguity which does not exist. In applying the clearly expressed intent of Congress, we can only conclude that "feasible" means "capable of being done" or "physically possible," and as a matter of law, the Chief erred in ordering that the portages remain open.
 
 
 21
 Because we conclude that the statute is clear, we need not concern ourselves with the Act's legislative history. We note, however, that the Act's legislative history supports the Friends' interpretation of the word feasible. The legislative history reveals a long-standing dispute between motorized and non-motorized uses in the Boundary Waters Canoe Wilderness Area. House Bill H.R. 12250 would have terminated all motorized portages. 124 Cong. Rec. S17, 890 (daily ed. Oct. 9, 1978). During congressional deliberations, Senate Subcommittee Chair James Abourezk directed the opposing parties to compromise on several key issues, including portages. Id. at S17,889 (Statement of Sen. Wendell Anderson). The parties met and negotiated a compromise known as the "Dayton-Walls" compromise. Id. This compromise, instead of banning all portages as set forth in the House Bill, permitted two mechanized portages to exist indefinitely, BWCWA § 4(d), and proposed the "feasible means" test for the other three portages in issue. 124 Cong.Rec. S17,889 (daily ed. Oct. 9, 1978). Representative Phillip Burton, manager of the House Conference Committee explained:
 
 
 22
 The final bill requires that the Secretary is to terminate all motorized use of the Prairie Portage from Sucker Lake to Basswood Lake, the Fourmile Portage from Fall Lake to Basswood Lake, the Trout Lake Portage from Lake Vermillion to Trout Lake on January 1, 1984, unless "no feasible nonmotorized means of transporting boats" between the lakes previously served by these portages is available.
 
 
 23
 I understand that feasible methods of transporting such boats in fact are already in use in the BWCA. I understand that during the compromise discussions it was agreed that "feasible" meant a method involving two able-bodied resort guests and one able-bodied guide.
 
 
 24
 The compromise agreement simply requires that there be a feasible nonmotorized method of moving boats with motors no larger than 25 horsepower between the lakes in question, using three able-bodied adults. It does not require that the portage routes be the same ones now traversed by trucks.
 
 
 25
 For example, the Fourmile Portage truck trail from Fall Lake to Basswood Lake could be replaced by portaging through Newton Lake to Pipestone Bay of Basswood, and then from Pipestone Bay to Back Bay to reach the specific areas now served by the Fourmile Portage. Such a route already exists, and the portages involved are suitable for nonmotorized transport of such boats.
 
 
 26
 In fact, the Forest Service has allowed only nonmotorized transport of boats from Fall Lake to Basswood via the Newton Lake-Pipestone Bay route for several years now. The method often used for larger boats is to strap or otherwise attach a carriage with bicycle wheels beneath one end of the boat, and then simply wheel the boat across the portage--like a wheelbarrow--with motor and fishing gear, gas cans, et cetera inside the boat. This method is feasible and proven, and I would expect that the Secretary will terminate motorized use of these portages and permit that method to be used.
 
 
 27
 Some people have suggested using rollers or a hand-operated tram-on rails, but those methods require permanent structures and mechanical equipment within the wilderness. Such developments are inappropriate. Following termination of motorized used in 1984, I expect the Secretary to obliterate any unused truck trails, remove any unused docks, and otherwise eliminate as nearly as possible any evidence of man's works.
 
 
 28
 124 Cong.Rec. H13,438 (daily ed. Oct. 14, 1978).
 
 
 29
 The Chief argues that Representative Burton's statement is of no help because the statute itself is unambiguous, and the most authoritative source for determining congressional intent lies in the Committee Report. The Chief says that Burton's statement is at odds with the Committee Report and, therefore, cannot be given any weight. Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19, 29, 109 S.Ct. 278, 283-84, 102 L.Ed.2d 186 (1988). The Chief cites a statement in the Committee Report which explains that a compromise was reached to "afford increased protection of the area's wilderness character while allowing the continuation of the most heavily used and long established motorized uses." S.Rep. No. 95-1327, 95th Cong., 2d Sess. 295-96 (1978). The Chief and the intervenors suggest that the Friends' true goal is to do away with outboard motors on Basswood and Trout Lakes despite Congress' express authorization allowing motorboats on these lakes. They point out that prohibiting motorized portages will prevent many people, particularly older people, from enjoying the area.
 
 
 30
 Although we need not consider Burton's statement as dispositive, we note that his statement is consistent with our interpretation of "feasible." See Brock v. Pierce County, 476 U.S. 253, 263, 106 S.Ct. 1834, 1840, 90 L.Ed.2d 248 (1986). When the entire Committee Report is read, it is obvious that the passage the intervenors point to concerns snowmobile use, and has absolutely nothing to do with motorized portages. We think the compromise, permitting motorized uses on two of the portages and incorporating the feasibility test for the other three portages, reflects a clear congressional intent to ban motorized portages unless it was physically impossible to transport boats to lakes served by the portages.
 
 
 31
 We reverse the district court order.
 
 
 32
 MAGILL, Circuit Judge, dissenting.
 
 
 33
 Because I find that the statute here is far from clear and the Chief's decision constitutes a reasonable interpretation of the congressional mandate, I respectfully dissent.
 
 
 34
 The facts are adequately set out in the majority opinion. Review of agency interpretations of statutes requires courts to apply the two-pronged test set forth in Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The majority sets out the proper standard:
 
 
 35
 We must first determine 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' If the statute is silent or ambiguous, we may only review the agency's action to determine whether that action 'is based on a permissible construction of the statute.'
 
 
 36
 Maj. op. at 1486 (citing Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781).
 
 
 37
 The majority fails, however, in its application of this standard. The court's charge under prong one of Chevron is to interpret the language of the statute and determine congressional intent, using the traditional tools of statutory interpretation. Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9. According to the Supreme Court, statutory interpretation begins with examination of the statutory text. See, e.g., United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). If that text is clear, resort even to legislative history is unnecessary. Id.
 
 
 38
 Here, then, the question under prong one of Chevron should be whether Congress clearly intended that feasible nonmotorized means meant any "physically possible" alternative means. I contend that a fair reading of the statutory text and legislative history demonstrate it did not.
 
 
 39
 Section 4(g) of the Boundary Waters Canoe Area Wilderness Act provides:
 
 
 40
 Nothing in this Act shall be deemed to require the termination of the existing operation of motor vehicles to assist in the transportation of boats across the [Prairie Portage, Four Mile Portage, and Trout Lake Portage] during the period ending January 1, 1984. Following said date, unless the Secretary determines that there is no feasible nonmotorized means of transporting boats across the portages to reach the lakes previously served by the portages listed above, he shall terminate all such motorized use of each portage listed above.
 
 
 41
 Boundary Waters Canoe Area Wilderness Act of 1978, Pub.L. 95-495, § 4(g), 91 Stat. 1649, 1651 (1978) (emphasis added). This court recognizes, correctly, that "feasible" can support the meanings proffered by both appellants and appellees.[1] It then proceeds to hold that § 4(g) demonstrates on its face, without resort to legislative history, a clear congressional intent that feasible means physically possible.
 
 
 42
 To reach this conclusion, the court accepts appellant's contention that "feasible" is a term of art with a commonly accepted meaning in environmental statutes, and that Congress intended that meaning in § 4(g). Courts often look to other statutes as a guide to statutory meaning. Such inquiry, however, is always an effort to determine congressional intent. Here, it appears that the court has blindly adopted the definition of "feasible" from other statutes without considering whether Congress intended to adopt that definition.
 
 
 43
 First, the court provides no evidence from either the statutory text or the legislative history to suggest that Congress adopted the definition of "feasible" in other statutes into § 4(g). Thorough inquiry convinces me that none exists.[2] Moreover, the statutes cited as establishing the "accepted" definition of feasible are inapposite. They all deal with engineering or technological capabilities, while § 4(g) requires the Forest Service to determine whether human beings have the physical capacity to traverse the portages in question. Because the statutes do not concern analogous subjects, there is no reason to believe, without some specific indication, that Congress adopted such an inapt definition.
 
 
 44
 Without the inapt definition of "feasible" imported from other statutes, § 4(g) does not directly answer how the Forest Service is to determine the feasibility of alternative means. Because I find the plain language of the statute ambiguous, I must examine the legislative history. It likewise provides little help.
 
 
 45
 As noted above, I find no legislative history explicitly considering whether Congress used feasible to mean "physically possible." There exists, however, some history concerning the "feasibility" of portage wheels. Appellants, and this court, cite at length from the floor statements of Rep. Burton, the House sponsor. Rep. Burton stated, after conference, that, inter alia, "feasible non-motorized means" existed at the time of the bill's consideration. Speaking about portage wheels, he stated: "This method is feasible and proven, and I would expect that the Secretary will terminate motorized use of these portages and permit that method to be used." 124 Cong.Rec. H13,438 (daily ed. Oct. 14, 1978).
 
 
 46
 There are two reasons to be wary of this statement. First, it is the statement of one who, while not a dissenter, did not get what he wanted in the revised bill after conference. The bill championed by Rep. Burton and passed by the House would have closed all motorized portages immediately. It appears that Rep. Burton attempted to write into the legislative history what he could not write into the law. See In re Sinclair, 870 F.2d 1340 (7th Cir.1989) (Easterbrook, J.). Second, the compromise reached suggests that Congress did not believe feasible means, as defined in § 4(g), existed in 1978. Rep. Burton's statements seem to imply that the statutory deal simply provided a six-year phase out period for the four named portages. But if that is what Congress intended, they much more easily could have stated that "as of January 1, 1984, the following portages shall terminate." Instead, Congress directed an executive agency to interpret an ambiguous statutory term and to determine at the end of the six-year period whether the portages should remain open. In the face of such evidence, we would be blind to the realities of the legislative process if we took Rep. Burton's words to be an objective, unbiased statement of the Congress' intent in enacting § 4(g).
 
 
 47
 Because neither the statutory text nor the legislative history provides credible evidence of a clear legislative intent concerning the definition of the term "feasible," I must reach prong two of Chevron: "whether the agency's answer is based upon a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. In prong two, courts properly consider whether the agency's action or interpretation is reasonable in view of the statute's purposes. In this case, we must measure the Forest Service's decision in that context.
 
 
 48
 The court correctly recognizes that one of Congress' overarching goals in enacting the BWCAW Act was to discourage motorized use. In assessing the feasibility of alternative nonmotorized means, the Chief recognized, however, that Congress intended motorized use to continue on the lakes serviced by the portages in question. Senator Wendell Anderson of Minnesota stated:
 
 
 49
 The bill passed by the House attempted to give wilderness protection to this unique area while still providing for a continuation of limited motorized use. This area is a prized area for sports enthusiasts and fishermen of all kinds. Many small resorts have flourished surrounding these beautiful lakes. In order to protect these businesses and to continue to allow sport fishermen to fish these prize trout and walleye lakes, I have worked to amend the House version of this bill to provide motorized use on a greater number of lakes. In almost every case lakes necessary for a resort to maintain its business have been kept open for the use of small motors.
 
 
 50
 Statement of Senator Wendell Anderson, 124 Cong.Rec. S.17889 (daily ed. Oct. 9, 1978). Thus, we must balance these contradictory intentions. I believe that absent more, the specific must trump the general. The legislative intent to allow motorized use on the lakes serviced by these portages belies a congressional desire to place limits upon access to those lakes that would exclude many who were using them at the time the law was passed.
 
 
 51
 When viewed in this context, the Chief's decision that no feasible nonmotorized means existed is reasonable and consistent with the statute. First, the tests the Forest Service conducted were consistent with the statute. Recognizing the congressional desire to continue motorized use on these lakes, the Forest Service attempted to determine the average user of these portages, and to tailor its tests to mirror that use. Portage Report at 5-7; Determination of Feasibility for Three Motorized Portages Within the Boundary Waters Canoe Area Wilderness, Oct. 11, 1989, (hereinafter Determination) at 2. The Forest Service attempted to determine whether feasible means other than portage wheels existed; however, appellants insisted that only portage wheels be tested. Determination at 2. It also considered the use of alternative routes for some of the portages, but discovered that other provisions of the Act prohibited such use. Determination at 4.[3]
 
 
 52
 The Chief's conclusion following these tests, that no feasible nonmotorized means existed, is likewise reasonable and consistent with the statute. Although 76% of those who attempted the portages during the test completed them successfully, the Chief determined that they exerted significantly more effort than the average portage user because of the media coverage and the air of competition surrounding the tests. Determination at 4-5. A physiological study determined that the test participants, who tested considerably above the national average for cardiovascular fitness, worked to near physical capacity in completing the portages. Determination at 4-5. The physiologist who reviewed the tests stated that:
 
 
 53
 The manual portaging of these boats on the available portage wheels is a task that required high levels of sustained physical effort and, in the case of the Four Mile Portage, marathon-like endurance performance. The data suggests that the level of effort and endurance required would not normally be achievable by people who are in "normal" physical condition for their age and gender. The excellent physical condition of the subjects tested contributed highly to their ability to complete the required tasks.
 
 
 54
 Portage Report, App. G; Determination at 4-5. Based upon congressional intent to continue motorized use of these lakes, it was reasonable for the Chief to consider the physical effects on people in "normal" physical condition when making his decision.
 
 
 55
 The feasibility report submitted to the Chief noted other safety concerns that support the reasonableness of his decision. The report concluded that the test provided a somewhat idealized situation. Many using portage wheels would not have the same training or take the same safety precautions as the test participants. Those using the portages may have spent several days in the Boundary Waters and may be fatigued or dehydrated and thus more susceptible to injury. Portage Report at 21. The tests also did not approximate the normal use of the portages, in which people pass each other and must keep adequate distance between boats. Id. Finally, the report raised concerns about the condition of the portages deteriorating and leading to safety problems once motorized use ceased. Id. at 21; Determination at 3. The Chief reasonably considered the impact of normal use of the portages, and not just the results from an idealized test situation, in making his decision.
 
 
 56
 Appellants challenge the Chief's consideration of safety concerns in making his determination, contending that the statutory term "feasible" does not allow such considerations. For this proposition, appellants cite the Supreme Court's decision in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In Overton Park, the Court held that the Secretary could not engage in a wide ranging balancing of factors, including safety considerations, to conclude whether another highway route was "prudent." This reliance is inapposite. First, Overton Park does not stand for the proposition that safety considerations were irrelevant to the decision involved therein. It would border on ridiculous to suggest that the safety of those using a highway could not be considered in determining, as the Court required, whether use of a particular highway route is "feasible" as a "matter of sound engineering." The Court merely intended that the Secretary not engage in ad hoc balancing of the relative merits of the particular routes.
 
 
 57
 Moreover, Overton Park is irrelevant to this situation. The choice of an alternative route for a highway will create no specific safety concerns independent of those subsumed in an analysis of sound engineering practice. That is not true in this case. The level of physical exertion required to complete these portages directly relates to the health and safety of those using them. In light of congressional intent to keep these lakes open for use by sports fishermen using motorboats, it is imminently reasonable for the administrative decisionmaker to consider the effect on the health of the people likely to be affected. "Feasibility," in light of all the circumstances, should not be construed to create an unreasonable risk for those who Congress intended could continue to use the lakes in question.[4]
 
 
 58
 Because Congress did not explicitly define "feasible nonmotorized means," I would defer to the Forest Service's reasonable decision. This conclusion does not imply a lack of respect for the legislative branch; instead, I believe it fosters respect. If Congress clearly directs, we judges will follow. Here, however, it appears that Congress decided not to decide the status of these portages, and left that decision to the agency. By deferring to the agency, we respect that congressional decision. Moreover, by leaving policy decisions to the politically accountable agencies rather than the judiciary, we foster democratic accountability. I respectfully dissent.
 
 
 
 [1]
 Sierra Club; the Wilderness Society; Defenders of Wildlife; Wilderness Watch; Wilderness Inquiry; Minnesota Public Interest Research Group; and Izaak Walton League of America, Inc
 
 
 [2]
 We described this area in Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1316 (8th Cir.1974) (en banc)
 
 
 [3]
 The intervenors include the City of Ely, Minnesota; Conservationists with Common Sense; Wilderness Outfitters, Inc.; and F.B. Hubachek, Jr
 
 
 [1]
 Commentators have suggested that "feasible" is a term Congress often uses to grant administrative discretion. See, e.g., Laurence H. Silberman, Chevron--The Intersection of Law and Policy, 58 Geo.Wash.L.Rev. 821, 823, 825 (1991) ("Finding a specific congressional intent is particularly unlikely if the agency is applying statutory language that calls for administrative judgment, such as what is 'feasible' or 'probable.' "); Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv.L.Rev. 405, 419 (1990)
 
 
 [2]
 While the floor statements of Rep. Burton suggest that the Forest Service should consider portage wheels to be presumptively "feasible" means, he says nothing specifically about whether Congress adopted the definition of "feasible" from other environmental statutes. Moreover, there are persuasive reasons to distrust Rep. Burton's statements concerning congressional intent
 
 
 [3]
 The BWCAW Act put limits on motorized use on the lakes where it was still allowed. The alternative routes appellants suggested for the Four Mile Portage would not be feasible because, as the Chief found, "motorized use of Newton Lake and Pipestone Bay would exceed the quota limits established in the BWCA Wilderness Act if use from the Four Mile Portage were diverted to this area." Determination at 4
 
 
 [4]
 Appellants also contend that the Forest Service's safety conclusions were flawed because it failed to compare the exertion required to complete other portages in the Boundary Waters. This argument fails. First, such a consideration would be relevant only if one could assume that all other factors were equal, i.e., the type of equipment portaged and the physical fitness of those using the portage. Second, Congress did not direct the Forest Service to make such a comparison