Filed 5/17/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CALIFORNIA MANUFACTURERS & TECHNOLOGY ASSOCIATION, | C089451 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201780002769) |
| v. | |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen H. Sumner, Judge. Affirmed.

Reed Smith, Raymond A. Cardozo, and Brian A. Sutherland for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Matthew Rodriguez, Chief Assistant Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Tracy L. Winsor and Russell B. Hildreth, Deputy Attorneys General, for Defendant and Respondent.

Robins Borghei, Todd E. Robins, Jed J. Borghei, and Taeva C. Shefler for Arvin Community Services District and Vaughn Water Company as Amicus Curiae on behalf of Defendant and Respondent.

1

The State Water Resources Control Board (Board) is charged with implementing the California Safe Drinking Water Act, a comprehensive statutory scheme designed to ensure that members of the public are provided with safe and clean drinking water. (Health & Saf. Code, § 116270 et seq.; the Act).[1] Among other things, the Board is responsible for setting drinking water standards for contaminants which may have an adverse effect on public health. (§ 116365, subd. (a).) This case concerns the drinking water standard for 1, 2, 3 - trichloropropane (TCP), a chemical known to cause cancer.

The Board promulgated a regulation setting the drinking water standard for TCP in 2017. (Cal. Code Regs., tit. 22, § 64444, Table 64444-A.) Kern County Taxpayers Association and California Manufacturers and Technology Association (Association) challenged the regulation by petition for writ of ordinary mandate.[2] (Code Civ. Proc., § 1085.) The trial court denied the petition. The Association appeals, arguing the Board failed to comply with the Act's requirement that new drinking water standards be "economically feasible." The Association also argues the Board failed to comply with the economic impact assessment requirements of the Administrative Procedures Act (Gov. Code, § 11340 et seq.). We reject both contentions and affirm.

## I. BACKGROUND

A. *The Federal and California Safe Drinking Water Acts*

Congress passed the Safe Drinking Water Act (the federal Act) in 1974. (Pub. L. No. 93-523 (Dec. 16, 1974) 88 Stat. 1660, codified at 42 U.S.C.S. § 300f et seq.) The federal Act was intended "to assure that water supply systems serving the public meet minimum national standards for protection of public health." (See *Bath Petroleum*

---

[1] Undesignated statutory references are to the Health and Safety Code.

[2] Kern County Taxpayers Association filed a request for dismissal on February 4, 2020, approximately one week after the filing of the opening brief in this appeal. We granted the request by order dated February 11, 2020.

*Storage, Inc. v. Sovas* (N.D.N.Y. 2004) 309 F.Supp.2d 357, 366.)  The federal Act empowers the U.S. Environmental Protection Agency (federal EPA) to establish national drinking water regulations applicable to all public water systems.  (42 U.S.C.S. § 300f(1).)  Such regulations are commonly expressed as maximum contaminant levels (MCLs), which refer to "the maximum permissible level of a contaminant in water which is delivered to any user of a public water system."  (42 U.S.C.S. § 300f(3).)

Our Legislature passed California's version of the federal Act in 1976.  (Stats. 1976, ch. 1087, § 2, pp. 4908-4930, formerly codified at § 4010 et seq., presently codified at § 116270 et seq.)  Among the legislative purposes of the Act are "to ensure that the water delivered by public water systems of this state shall at all times be pure, wholesome, and potable."  (§ 116270, subd. (e).)  To effectuate this purpose, the Act articulates a state policy to "reduce to the lowest level feasible all concentrations of toxic chemicals that, when present in drinking water, may cause cancer, birth defects, and other chronic diseases."  (§ 116270, subd. (d).)  The Act also expresses an intent to establish a safe drinking water program "that is more protective of public health than the minimum federal requirements."  (§ 116270, subd. (f).)

As relevant here, the Act directs the Board to promulgate "primary drinking water standards for contaminants in drinking water."  (§ 116365, subd. (a).)  Primary drinking water standards include MCLs for contaminants that, "in the judgment of the state board, may have an adverse effect on the health of persons."  (§ 116275, subd. (c)(1).)  Section 116365, subdivision (a) directs the Board to set the MCL for a given contaminant "as close as feasible" to the public health goal for that contaminant, "placing primary emphasis on the protection of public health."[3]  Public health goals are set by the Office of

_____

[3] Section 116365, subdivision (a) provides:  "The state board shall adopt primary drinking water standards for contaminants in drinking water that are based upon the criteria set forth in subdivision (b) and shall not be less stringent than the national

3

Environmental Health Hazard Assessment, and reflect "an estimate of the level of the contaminant in drinking water that is not anticipated to cause or contribute to adverse health effects, or that does not pose any significant risk to health." (§ 116365, subd. (c)(1).) Unlike MCLs, which are the product of several statutorily enumerated considerations (described below), public health goals are based exclusively on public health considerations. (§ 116365, subd. (c)(1).) Public health goals are aspirational rather than mandatory or enforceable. (§ 116365, subd. (c); see also *Ohio v. United States EPA* (D.C. Cir. 1993) 997 F.2d 1520, 1529.)

Section 116365, subdivision (b), with which we are principally concerned, directs the Board to consider three criteria in setting MCLs. First, the Board must consider the public health goal for the contaminant. (§ 116365, subd. (b)(1).) Second, the Board must consider the national primary drinking water standard for the contaminant, if any. (§ 116365, subd. (b)(2).) Third, the Board must consider: "The technological and economic feasibility of compliance with the proposed primary drinking water standard." (§ 116365, subd. (b)(3).) "For the purposes of determining economic feasibility pursuant to this paragraph," subdivision (b)(3) elaborates, "the state board shall consider the costs of compliance to public water systems, customers, and other affected parties with the

---

primary drinking water standards adopted by the United States Environmental Protection Agency. A primary drinking water standard adopted by the state board shall be set at a level that is as close as feasible to the corresponding public health goal placing primary emphasis on the protection of public health, and that, to the extent technologically and economically feasible, meets all of the following: [¶] (1) With respect to acutely toxic substances, avoids any known or anticipated adverse effects on public health with an adequate margin of safety. [¶] (2) With respect to carcinogens, or any substances that may cause chronic disease, avoids any significant risk to public health."

proposed primary drinking water standard, including the cost per customer and aggregate cost of compliance, using best available technology." (§ 116365, subd. (b)(3).) The present case turns on the meaning of "economic feasibility," as used in section 116365, subdivision (b)(3).

B.      *The Challenged Regulation*

The Board began rulemaking proceedings to adopt an MCL for TCP in February 2017. An initial statement of reasons accompanying the proposed regulation describes TCP as a chlorinated hydrocarbon that has historically been used as an industrial solvent, cleaning and degreasing agent, and paint and varnish remover. TCP has also been found in soil fumigants. According to the initial statement of reasons, TCP has been detected in drinking water sources in a significant number of California counties (24 out of 58), including more than 100 drinking water sources in Kern County alone. As noted, TCP is a known carcinogen.

The initial statement of reasons sets forth the Board's findings for each of the criteria required by section 116365, subdivision (b) (summarized below), and proposes an MCL of 5 parts per trillion, the lowest and most protective of six possibilities considered by the Board.[4] Most of the Board's findings are undisputed; even so, they are recounted here briefly for context.

First, the Board determined that the public health goal for TCP has been set at 0.7 parts per trillion, a determination the Association does not challenge. Thus, the Board was required to set the MCL for TCP "as close as feasible" to the public health goal of 0.7 parts per trillion. (§ 116365, subd. (a).)

---

[4] Contaminant concentrations are sometimes expressed in terms of micrograms per liter ("parts per billion") or, at lower concentrations, as nanograms per liter ("parts per trillion").

Second, the Board determined that the EPA has not established an MCL for TCP, another determination the Association does not challenge. Thus, the Board was not required to consider any national MCL for TCP.

Third, the Board considered the technological and economic feasibility of six possible MCLs for TCP: 5, 7, 15, 35, 70, and 150 parts per trillion. For technological feasibility, the Board identified granular activated carbon as the best available technology for treating TCP in drinking water. The Board found that granular activated carbon has been shown to successfully reduce TCP in drinking water to levels below 5 parts per trillion, below the lowest of the MCLs under consideration. The Board thus determined that an MCL of 5 parts per trillion was technologically feasible, and "as close as feasible to the corresponding public health goal" of 0.7 parts per trillion. (§ 116365, subd. (a).) The Association does not challenge any of the Board's findings or conclusions with respect to technological feasibility.

Turning to economic feasibility, the Board focused on the estimated costs of compliance for each of the contemplated MCLs, assuming the use of granular activated carbon as a treatment technology. For each possible MCL, the Board estimated the number of water systems that would be affected, the aggregate annual costs of compliance for all affected systems statewide, and the average annual costs for service connections (e.g., households or customers) in large water systems (with 200 or more service connections) and small water systems (with fewer than 200 service connections). These estimates (which the Association does not challenge) are summarized in the table below:

| Contemplated MCL | Annual aggregate costs (in millions) | Number of systems affected | Average annual cost for service connections in small water systems | Average annual cost for service connections in large water systems |
|---|---|---|---|---|
| 5 | $33.9 | 103 | $609 | $25 |
| 7 | $26.9 | 89 | $660 | $24 |
| 15 | $20.7 | 66 | $600 | $21 |
| 35 | $11.3 | 45 | $632 | $14 |
| 70 | $6.6 | 30 | $501 | $14 |
| 150 | $3.2 | 12 | $872 | $10 |

As shown in the table, the Board estimated that aggregate, statewide annual costs of compliance for the lowest and most protective MCL (5 parts per trillion) would be $33.9 million, compared to $3.2 million for the highest and least protective MCL (150 parts per trillion). Customers in small water systems would pay more, the Board found, due to the smaller number of customers bearing the costs of compliance. But the estimated costs of compliance were not expected to increase significantly as the MCL approached 5 parts per trillion. For example, customers in large water systems would be expected to pay $25 per year for an MCL of 5 parts per trillion, and $21 per year for an MCL of 15 parts per trillion, a difference of only $4 per year. Similarly, customers in small water systems would be expected to pay an additional $609 per year for an MCL of 5 parts per trillion, and $600 per year for an MCL of 15 parts per trillion, a difference of $9 per year.[5] Thus, despite a wide range in aggregate costs, the Board anticipated that

[5] We note that customers in small water systems would be expected to pay $872 per year for an MCL of 150 parts per trillion, and $609 per year for an MCL of 5 parts per trillion. We would ordinarily expect annual costs to increase as the MCL becomes more protective, as is the case in the column showing costs for customers served by large water systems. The parties do not discuss the nonlinear relationship between annual costs and

7

customers would be unlikely to realize significant cost savings from the selection of a higher and less protective MCL.

The Board also considered the benefits of the contemplated MCLs, including the "estimated annual cost per theoretical excess cancer cases reduced," for large and small water systems. By way of example, the Board estimated that the aggregate annual cost of complying with an MCL of 5 parts per trillion would be $33.9 million and would result in the avoidance of 2.36 cancer cases, while the aggregate annual cost of complying with an MCL of 7 parts per trillion would be $26.9 million and would result in the avoidance of 2.32 cancer cases. As before, the Board anticipated that costs would be greater for small water systems, as small water systems would be unlikely to realize the same economies of scale as large water systems.

The Board identified other anticipated benefits of the proposed regulation, including ensuring access to safe and clean drinking water, reducing exposure to a chemical known to cause cancer, and reducing the use of bottled water and alternatives to drinking water such as sweetened beverages and soda. The Board did not attempt to assign dollar values to these benefits.

Turning to the ultimate question of economic feasibility, the Board concluded that the proposed MCL of 5 parts per trillion would not place a significant economic burden on the State of California as a whole. The Association does not challenge the Board's conclusion.

As noted, the Board also found the proposed MCL would raise rates for service connections in large water systems by an estimated $25 per year, or $2.08 per month. The Board implicitly found the increase to be economically feasible, and the Association

---

contemplated MCLs for customers served by small water systems, and the issue is immaterial to the issues raised by this appeal.

8

does not suggest otherwise. But the estimated increase for service connections in small water systems is another story.

As noted, the Board estimated the proposed MCL would raise rates for service connections in small water systems by $609 per year, or $50.75 per month. The initial statement of reasons "acknowledges that some [small water systems] are economically disadvantaged and that the estimated annual cost of $609 per connection could represent a significant financial burden to some California communities."[6] Nevertheless, the Board found "the cost per connection of centralized treatment does not greatly decrease at higher MCLs and therefore, an economically disadvantaged [small water system] would likely not find a higher MCL to be more economically feasible." Furthermore, the Board observed that there might be alternatives to centralized treatment that would be less costly for small water systems, including point-of-entry treatment, which involves treating only the water entering a house or building, rather than all of the water sent to the distribution center. The Board further observed that the regulatory process of qualifying for point of entry treatment requires a showing of economic infeasibility (Cal. Code Regs., tit. 22, §§ 64420-64420.1), and suggested that small water systems may be able to make such a showing. The Board also observed that small water systems may be eligible for grants and low interest loans through funding programs maintained by the Board.

Based on the foregoing, the Board concluded that, "although the estimated annual cost of $609 may be economically infeasible for a [small water system], there may be alternative, lower-cost treatment options and financing opportunities, such as grants and low-interest loans from the State Water Board, which would make centralized treatment economically feasible." Accordingly, the Board concluded that the proposed MCL of 5

---

[6] The initial statement of reasons observes that the median household income for California in 2014, as reported by the U.S. Census Bureau, was $61,489.

9

parts per trillion was economically feasible, notwithstanding the potential burden on households and customers served by small water systems.

Having determined that the proposed MCL would satisfy the statutory criteria required by section 116365, the Board next considered reasonable alternatives to the regulation that would lessen any impact on small business, and the Board's reasons for rejecting them. (Gov. Code, § 11346.2, subd. (b)(4).) After recapitulating the above-described discussion of economic feasibility, the Board concluded: "To the extent that this regulation will have any impact on small businesses, the reasons for rejecting alternatives that may reduce an impact on small businesses is the same above: a higher MCL would be inconsistent with . . . section 116365, would be somewhat less protective of public health, and would not result in significant cost savings." (Fn. omitted.)

The Board acknowledged that "a small number of the identified public water systems likely provide water solely to businesses, and that public water systems identified as community water systems often provide water to businesses." The Board assumed that public water systems that would be required to incur costs to comply with the proposed MCL would pass those costs on to their customers, including businesses. The Board did not specifically consider the economic impact of the proposed MCL on operators of nontransient noncommunity water systems, such as food processors and agricultural businesses.[7]

Based on the foregoing, the Board concluded that, "any economic impact to businesses statewide is not anticipated to be significant." Accordingly, the Board

---

[7] Nontransient noncommunity water systems are public water systems that are not community water systems and that regularly serve at least 25 of the same persons over six months per year. (§ 116275, subd. (k).) Community water systems are public water systems that serve at least 15 service connections used by yearlong residents, or that regularly serve at least 25 yearlong residents of the area served by the system. (§ 116275, subd. (i).)

10

proposed setting the MCL at 5 parts per trillion, the lowest of the six possibilities under consideration. Following a comment period and public hearing, the Board adopted a regulation setting the MCL for TCP at 5 parts per trillion. (Cal. Code Regs., tit. 22, § 64444, Table 64444-A.)

C.     *The Petition*

Kern County Taxpayers Association and the Association filed their petition for writ of mandate on December 18, 2017. The petition alleges that the Board failed to comply with the Act and the Administrative Procedure Act in setting the MCL for TCP. Specifically, the petition alleged that the Board failed to determine the economic feasibility of the new MCL and failed to analyze the economic impacts of the MCL on businesses that operate their own water systems, such as nontransient, noncommunity water systems, and mutual water systems. The petition sought an order requiring the Board to withdraw the MCL for TCP and promulgate a new one.

The petition was set for hearing in December 2018. In anticipation of the hearing, the Association and the Board each filed requests for judicial notice. The Association requested judicial notice of a trial court order granting a petition for writ of mandate in another action against the Board, this one arising out of a challenge to the MCL for hexavalent chromium, designated by the parties as the "Chrome 6" case. (*California Manufacturers and Technology Association et al. v. State Water Resources Control Board* (Superior Ct. Sacramento County, 2017, No. 34-2014-80001850) ("*Chrome 6*").) The Board, for its part, sought judicial notice of the State of California Drinking Water Annual Compliance Report for 2017, which shows that more than 95 percent of Californians are served by large water systems, and less than two percent are served by small water systems.

Following argument, the trial court denied the petition, finding that the Association failed to show the Board abused its discretion in setting the MCL at 5 parts per trillion. The trial court rejected the Association's argument—renewed herein—that

11

the Act required the Board to conduct a cost-benefit analysis.  The trial court also rejected the Association's argument—also renewed herein—that the Board failed to consider economic impacts on businesses operating their own water systems.  The trial court denied the Association's request for judicial notice and granted the Board's.

The trial court entered judgment in the Board's favor in March 2019.  This appeal timely followed.[8]

## II.  DISCUSSION

### A.  *Compliance with the Act*

The Association challenges the MCL as inconsistent with the Act.  According to the Association, the Board (1) misinterpreted the statutory requirement that the proposed MCL be "economically feasible," (2) failed to perform a cost-benefit analysis of the contemplated MCLs, and (3) failed to apply any other discernible standard for determining economic feasibility.  We consider these contentions momentarily.  Before doing so, however, we address the Association's arguments based on the order granting the petition for writ of mandate in the *Chrome 6* case.  As the trial court correctly observed, the *Chrome 6* order has no precedential value (*In re Molz* (2005) 127 Cal.App.4th 836, 845), and cannot be considered under California Rules of Court, rule

---

[8] We have received an amicus curiae brief from Arvin Community Services District and Vaughn Water Company arguing, inter alia, that the Association lacks standing to challenge the MCL.  We decline to consider amicus curiae's standing argument, which is not among the contentions raised by the parties.  (See *Younger v. State of California* (1982) 137 Cal.App.3d 806, 813-814 [" ' "an appellate court will consider only those questions properly raised by the appealing parties.  Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered" ' "]; and see *Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1457, fn. 5 [declining to consider standing argument raised by amicus curiae].)  We have considered amicus curiae's other arguments.

12

8.1115, except in circumstances not present here.[9]  The Association does not suggest the trial court erred in denying the request for judicial notice of the order and does not seek judicial notice in this court.  We therefore decline to consider any of the Association's arguments based on the *Chrome 6* order.

    *1.     Standard of Review*

    The establishment of an MCL by the Board constitutes a quasi-legislative act subject to judicial review by ordinary mandate under Code of Civil Procedure section 1085.  (*Western States Petroleum Assn v. State Department of Health Services* (2002) 99 Cal.App.4th 999, 1006; *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1265-1266.)

    Our review of an administrative agency's quasi-legislative activity is limited.  As our Supreme Court has explained, " 'quasi-legislative rules . . . represent[] an authentic form of substantive lawmaking:  Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power.  [Citations.]  Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes.  When a court assesses the validity of such rules, the scope of its review is narrow.  If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end.'  [Citations.]  When a regulation is challenged on the ground that it is not 'reasonably necessary to effectuate the purpose of the statute,' our inquiry is confined to whether the rule is arbitrary, capricious, or without rational basis [citation], and whether substantial evidence supports the agency's determination

---

[9]  The Association argued in the trial court that the order was citable under California Rule of Court, rule 8.1115, subdivision (b)(1), which establishes an exception for opinions relevant under the doctrines of law of the case, res judicata, or collateral estoppel.  However, the trial court rejected this argument, and the Association does not press the issue on appeal.

13

that the rule is reasonably necessary [citation]." (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415.)

But our review of an agency's interpretation of a statute is not so limited. Where, as here, "an implementing regulation is challenged on the ground that it is 'in conflict with the statute' [citation] or does not 'lay within the lawmaking authority delegated by the Legislature' [citation], the issue of statutory construction is a question of law on which a court exercises independent judgment." (*Western States Petroleum Assn. v. Board of Equalization, supra,* 57 Cal.4th at p. 415.)

"In determining whether an agency has incorrectly interpreted the statute it purports to implement, a court gives weight to the agency's construction." (*Western States Petroleum Assn. v. Board of Equalization, supra,* 57 Cal.4th at p. 415.) "How much weight to accord an agency's construction is 'situational,' and greater weight may be appropriate when an agency has a ' "comparative interpretative advantage over the courts," ' as when ' "the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion." ' [Citation.] Moreover, a court may find that 'the Legislature has *delegated* the task of interpreting or elaborating on a statute to an administrative agency,' for example, when the Legislature 'employs open-ended statutory language that an agency is authorized to apply or "when an issue of interpretation is heavily freighted with policy choices which the agency is empowered to make." ' [Citations.] In other words, the delegation of legislative authority to an administrative agency sometimes 'includes the power to elaborate the meaning of key statutory terms.' [Citation.] Nevertheless, the proper interpretation of a statute is ultimately the court's responsibility." (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 461-462.)

2.      *Principles of Statutory Interpretation*

We review questions of statutory interpretation "seeking, as always, to ascertain the Legislature's intent so as to give effect to the law's purpose." (*In re Corrine W.*

(2009) 45 Cal.4th 522, 529; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 927.) "We begin with the statute's plain language, as the words the Legislature chose to enact are the most reliable indicator of its intent." (*In re Corrine W., supra,* at p. 529.) " '[I]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs.' " (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227.) If, however, the statutory language is ambiguous or reasonably susceptible to more "we will consider ' "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " (*Elsner v. Uveges, supra,* at p. 929.) "Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute." (*Allen v. Sully-Miller Contracting Co., supra,* at p. 227.)

### 3. *"Economic Feasibility"*

We begin with the Association's argument that the Board misinterpreted the requirement of "economic feasibility." As noted, section 116365, subdivision (a) directs the Board to set the MCL for a carcinogen "at a level that is as close as feasible to the corresponding public health goal[,] placing primary emphasis on the protection of public health, and that, to the extent technologically and economically feasible" avoids any significant risk to public health. Section 116365, subdivision (b) directs the Board to "consider" enumerated criteria, including "[t]he technological and economic feasibility of compliance" with the proposed MCL. (§ 116365, subd. (b)(3).) Section 116365, subdivision (b)(3) further provides: "For the purposes of determining economic feasibility pursuant to this paragraph, the state board shall consider the costs of compliance to public water systems, customers, and other affected parties with the proposed primary drinking water standard, including the cost per customer and aggregate

15

cost of compliance, using best available technology." The Act does not define the terms "economically feasible" or "economic feasibility."

" 'When a term goes undefined in a statute, we give the term its ordinary meaning.' " (*De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 590-591.) "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122.)

The Association correctly observes that dictionaries offer alternative definitions of the word, "feasible." For example, Webster's Third New International Dictionary defines "feasible" to mean: (1) "capable of being done, executed, or effected: possible of realization," (2) "capable of being managed, utilized or dealt with successfully: SUITABLE," and (3) "REASONABLE, LIKELY." (Webster's 3d New Internat. Dict. (1993) p. 831, col. 3.) The Oxford English Dictionary similarly defines "feasible" to mean: (1) "Capable of being done, accomplished or carried out; possible, practicable," (2) "Capable of being dealt with successfully in any way, either in a material or immaterial sense," and (3) "Likely, probable." (Oxford English Dict. (Online ed. 2021) https://www.oed.com/view/Entry/68798?redirectedFrom=feasible#eid [as of May 12, 2021], archived at <https://perma.cc/58Y7-HJ3L>.) The Association argues the Board misinterpreted the word "feasible" to mean "capable of being done" rather than "reasonable." We disagree.

We reiterate that the Act articulates a state policy to "reduce to the lowest level *feasible* all concentrations of toxic chemicals that, when present in drinking water, may cause cancer, birth defects, and other chronic diseases." (§ 116270, subd. (d), italics added.) It is unlikely that the Legislature, in adopting a statutory scheme expressly designed to be "more protective of public health than the minimum federal requirements," (§ 116270, subd. (f)) intended nothing more than to reduce concentrations of toxic chemicals in drinking water to "the lowest level *reasonable*." It is far more

16

likely that the Legislature intended to articulate a state policy of reducing concentrations of toxic chemicals in drinking water to the lowest level "capable of being done," subject to the limits of what is technically and economically possible.

Applying the principle that the same words or phrases should be given the same meaning within interrelated provisions of the law, we conclude that the word "feasible," as used in section 116365, subdivision (a) means "capable of being done," rather than "reasonable." (*Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 161 ["We generally presume that when the Legislature uses a word or phrase 'in a particular sense in one part of a statute,' the word or phrase should be understood to carry the same meaning when it arises elsewhere in that statutory scheme"].)[10] We likewise conclude that "economic feasibility," as used in section 116365, subdivision (b), means economically "capable of being done"; that is, capable of being done given "the management of domestic or private income and expenditure." (Oxford English Dict. (Online ed. 2021)

---

[10] We note that the Legislature has elsewhere defined the term "feasible" to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1 [defining "feasible" for purposes of CEQA review]; Pub. Resources Code, § 30108 [defining "feasible" under the Coastal Act]; Gov. Code, 65590, subd. (g)(3) [defining "feasible" under the Mello Act].) We also note that the U.S. Supreme Court and federal appellate courts have similarly defined "feasible" to mean "capable of being done." (*American Textile Manufacturers Institute, Inc. v. Donavan* (1981) 452 U.S. 490, 509 (*American Textile*) [holding that the "plain meaning" of the word "feasible," as used in provision of the Occupational Safety and Health Act, is " 'capable of being done, executed, or effected' " or " 'capable of being done, accomplished[,] or carried out' "]; see also *Friends of the Boundary Waters Wilderness v. Robertson* (8th Cir. 1992) 978 F.2d 1484, 1487-1488 [holding that "feasible," in the context of an environmental statute prohibiting motorized portage of canoes unless a non-motorized alternative is not feasible, means " 'capable of being done' " or " 'physically possible' "].)

<https://www.oed.com/view/Entry/59384?rskey=JZtOCC&result=1&isAdvanced=false#eid> [as of May 12, 2021], archived at <https://perma.cc/3GUG-2KUY> [defining "economic"].)

Taking a page from the trial court's order, we affirm that regulations are not "infeasible" because they impose financial burdens on businesses or consumers. (See, e.g., *United Steelworkers of America, AFL-CIO-CLC v. Marshall* (D.C. Cir. 1980) 647 F.2d 1189, 1265 [considering the requirement of economic feasibility in the context of regulations promulgated by the Occupational Health & Safety Administration, and holding that: "A standard is not infeasible simply because it is financially burdensome [citation], or even because it threatens the survival of some companies within an industry"]; see also *American Iron & Steel Institute v. Occupational Safety and Health Admin.* (D.C. Cir. 1991) 939 F.2d 975, 980 ["A standard is economically feasible if the costs it imposes do not 'threaten massive dislocation to, or imperil the existence of, the industry' "].) We further conclude, as the trial court did, that the Board's findings as to economic feasibility have not been shown to have been arbitrary, capricious, or without rational basis. (*Western States Petroleum Assn. v. Board of Equalization, supra,* 57 Cal.4th at p. 415.) We need not linger over these conclusions, however, as the Association does not directly argue that the MCL for TCP was economically infeasible or even unreasonable. Rather, the Association's arguments concerning the meaning of the words "economically feasible" and "economic feasibility" are stepping stones to another argument, to which we now turn.

*3.      Cost-Benefit Analysis*

Having concluded (erroneously, as we have shown) that "feasible" means "reasonable," the Association proceeds to the next phase of its argument; that section 116365 required the Board to conduct a cost-benefit analysis to determine the reasonableness of the contemplated MCLs. The Association's argument cannot be squared with the statutory language or the purpose of the statute.

Before diving into the Association's substantive arguments, we acknowledge some uncertainty as to what type of cost-benefit analysis the Association believes the Board should have done. The Act does not contain or define the term, and courts have long recognized that cost-benefit analyses "can take many forms." (*Sierra Club v. Sigler* (5th Cir. 1983) 695 F.2d 957, 976, fn. 15; see also *American Mining Congress v. Thomas* (10th Cir. 1985) 772 F.2d 617, 631 ["The label 'cost-benefit analysis' encompasses everything from a strict mathematical balancing formula to a less strict standard that merely requires the agency to recognize both the costs and benefits of specific proposed alternatives and consider the differences in choosing an appropriate alternative"].) As one federal appellate court has explained: "[Cost-benefit analysis] varies from a formal analysis in which all costs and benefits are quantified in an identical unit of measurement, usually dollars, and compared, to an informal analysis where costs and benefits are identified, quantified if possible, and balanced." (*Sierra Club v. Sigler, supra,* at p. 976, fn. 15; see also *Quivira Mining Company v. United States Nuclear Regulatory Commission* (10th Cir. 1989) 866 F.2d 1246, 1250 [describing differences between "cost-benefit optimization," the strictest type of cost-benefit analysis, and "cost-benefit rationalization," a looser approach].) The Association does not tell us what type of cost-benefit analysis the Act supposedly requires.[11]

Federal courts have also recognized that administrative agencies commonly rely on another form of economic analysis, one which the United States Supreme Court has termed "feasibility analysis." (*American Textile, supra,* 452 U.S. at p. 509.) Feasibility analysis, in the environmental context, "requires an agency to protect public health to the

---

[11] We note that the Board arguably conducted a form of cost-benefit analysis by considering both the costs of the contemplated MCLs and their anticipated benefits, including the "estimated annual costs for theoretical cancer cases reduced" and nonmonetary benefits, such as ensuring access to safe and clean drinking water.

19

maximum extent possible, constrained solely by what is economically or technically feasible." (*Quivira Mining Company v. United States Nuclear Regulatory Commission, supra,* 866 F.2d at p. 1250, fn. 4; see also *American Mining Congress v. Thomas, supra,* 772 F.2d at p. 631.) This approach places a lesser burden on an administrative agency than a cost-benefit analysis, which would typically require the agency to "monetize the costs and benefits of a regulation, balance the results, and then choose the regulation with the greatest net benefits." (*Entergy Corp. v. Riverkeeper, Inc.* (2009) 556 U.S. 208, 237 (dis. opn. of Stevens, J.) [observing that cost-benefit analyses are particularly controversial in the environmental context in which a regulation's financial costs are often more obvious and easier to quantify than its environmental benefits].) Significantly, for our purposes: "Feasibility analysis and cost-benefit analysis are mutually exclusive approaches." (*American Mining Congress v. Thomas, supra,* at p. 631, citing *American Textile, supra,* at p. 509; see also *Quivira Mining Company v. United States Nuclear Regulatory Commission, supra,* at p. 1250, fn. 4 [same].) We presume the Legislature was aware of these differing forms of economic analysis when it passed the Act. (See *Ramos v. Superior Court* (2007) 146 Cal.App.4th 719, 727 ["We presume the Legislature knew what it was saying and meant what it said"].)

Having defined our terms, we turn once more to the language of the statute. As previously discussed, section 116365, subdivision (a) requires the Board to set the MCL "at a level that is as close as feasible to the corresponding public health goal placing primary emphasis on the protection of public health." Section 116365, subdivision (b) requires the Board to "consider" enumerated criteria; namely, the public health goal for the contaminant, the national drinking water standard, if any, and the "technological and economic feasibility of compliance." "For purposes of determining economic feasibility," subdivision (b) continues, "the state board shall consider the costs of compliance to public water systems, customers, and other affected parties with the proposed primary drinking water standard, including the cost per customer and aggregate

20

cost of compliance, using best available technology." (*Ibid.*) This language seems to clearly contemplate a feasibility analysis, rather than a cost-benefit analysis.

The United States Supreme Court considered similar statutory language in *American Textile.* There, representatives of the cotton industry challenged proposed regulations limiting permissible exposure levels to cotton dust, an airborne particle byproduct of cotton products that causes serious and disabling respiratory diseases. (*American Textile, supra,* 452 U.S. at p. 494.) The regulations had been promulgated pursuant to section 6(b)(5) of the Occupational Safety and Health Act of 1970 (29 U.S.C. § 655(b)(5)), which requires the Secretary of Labor to "set the standard which most adequately assures, to the extent feasible . . . that no employee will suffer material impairment of health." (See *American Textile, supra,* at pp. 493-494.) The industry representatives argued that the federal statute required a showing that the costs of the proposed regulation bore a reasonable relationship to the anticipated benefits to employees. (*Id.* at p. 494.) The high court rejected the industry representatives' cost-benefit argument. (*Id.* at p. 509.) The court explained, first, that the plain meaning of the word "feasible" is " 'capable of being done.' " (*Ibid.*) The court then explained that, effectively: "Congress itself defined the basic relationship between costs and benefits, by placing the 'benefit' of worker health above all other considerations save those making attainment of this 'benefit' unachievable. Any standard based on a balancing of costs and benefits by the Secretary that strikes a different balance than that struck by Congress would be inconsistent with the command set forth in § 6(b)(5)[ of the Occupational Safety and Health Act]. Thus, cost-benefit analysis . . . is not required by the statute because feasibility analysis is." (*Ibid.*, fn. omitted.) The Supreme Court's analysis is helpful to us here.

As the Board observes, the Legislature expressly recognized the benefits of safe drinking water in passing the Act. (See § 116270, subds. (a) [declaring that every resident of California has the right to safe drinking water] & (e) [stating a legislative

21

intent to "ensure that the water delivered by public water systems of this state shall at all times be pure, wholesome, and potable"].)  Just as Congress defined the relationship between costs and benefits in the Occupational Safety and Health Act, so too has our Legislature placed the public health benefits of safe drinking water above all other considerations, save those that would make attaining those benefits unachievable.  (§ 116365, subd. (a) [directing Board to set MCLs "at a level that is as close as feasible to the corresponding public health goal *placing primary emphasis on the protection of public health*" (italics added)].)  And just as a balancing of costs and benefits by the Secretary would have undermined the legislative balance in *American Textile,* so too would a cost-benefit analysis by the Board upset the legislative balance struck by the Act.  (*American Textile, supra,* 452 U.S. at p. 509.)  Following the Supreme Court's analysis in *American Textile,* we conclude that section 116365 requires the Board to conduct a feasibility analysis, not a cost-benefit analysis.  (*American Textile, supra,* at p. 510 ["Thus, cost-benefit analysis . . . is not required by the statute because feasibility analysis is"].)

The Association's arguments to the contrary are unconvincing.  The Association directs our attention to *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, in which the court offered an overview of the Act, stating in dicta that the "setting of primary drinking water standards involves a balancing of public health concerns with questions of technological feasibility and cost."  (*Id.* at p. 679.)  But the *Groundwater* court was concerned with the extent to which an MCL can serve as a basis for civil liability under *Hartwell Corporation v. Superior Court* (2002) 27 Cal.4th 256 and the California Tort Claims Act.  (*Groundwater, supra,* at p. 680.)  The court was not concerned with the administrative process by which MCLs are set or the requirement that the Board determine the economic feasibility of a proposed MCL.  *Groundwater* cannot be said to support the Association's argument that section 116365 requires a cost-benefit analysis.

22

(See *People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10 ["It is axiomatic that cases are not authority for propositions not considered"].)

The Association next purports to find support for a required cost-benefit in section 116365, subdivision (b)'s enumeration of statutory criteria. But subdivision (b) does not say anything about quantifying the benefits of a proposed MCL, or balancing those benefits against the costs of compliance. Subdivision (b) merely requires that the Board "consider" the "economic feasibility of compliance," which is defined as "the costs of compliance to public water systems, customers, and other affected parties." (§ 116365, subd. (b).)[12] Subdivision (b) does not, by its terms, require any type of cost-benefit analysis.

The Association's reliance on section 116365, subdivision (b)(2) is equally unavailing. Subdivision (b)(2) directs the Board to consider any national primary drinking water standard for the contaminant adopted by the federal EPA. (§ 116365, subd. (b)(2).) The Association observes that national MCLs are themselves the product of statutorily-mandated cost-benefit analyses and invites us to conclude that subdivision (b)(2) incorporates by reference a requirement that the Board undertake s similar analysis. (42 U.S.C.S. § 300g-1(b)(3)(C)(i) [requiring analysis of quantifiable and nonquantifiable health risk reduction benefits and costs of compliance for each alternative MCL under consideration].) We decline the invitation. As the Board observes, the Legislature knows how to require a cost-benefit analysis when it chooses to do so. (See, e.g., §§ 43018.8, subd. (b) [requiring cost-benefit analyses for state programs affecting the adoption of zero-emission vehicles], 43630, subd. (c) [requiring cost-benefit analyses for standards for certifying devices capable of reducing emissions from motor vehicles].) Had the Legislature intended to require a cost-benefit analysis in

---

[12] The Association does not suggest the Board failed to consider the costs of the contemplated MCLs.

23

setting an MCL, it could have done so directly. The Legislature chose not to include any such requirement in section 116365, and we cannot rewrite the statute to conform to an intention that does not appear in its language. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632-633.)

The Association's reliance on section 116370 fails for similar reasons. Section 116370, which we have not yet discussed, directs the Board to "adopt a finding of the best available technology for each contaminant for which a primary drinking water standard has been adopted at the time the standard is adopted." The statute further requires that the finding "shall take into consideration the costs and benefits of best available treatment technology that has been proven effective under full-scale field applications." (§ 116370.) Section 116370 only serves to underscore the absence of any similar requirement in section 116365. Had the Legislature intended for the Board to consider both costs and benefits in determining economic feasibility, it could have said as much in section 116365. That the Legislature chose instead to focus on the "costs of compliance," omitting any mention of the anticipated benefits of the MCL, indicates that the determination of economic feasibility does *not* require a balancing of costs and benefits, at least not in the sense that the Association proposes. (*Southern Pac. Transportation Co. v. State Board of Equalization* (1985) 175 Cal.App.3d 438, 443 [" 'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded' "].) Section 116370 therefore fails to advance the Association's cause.

In the absence of any authority requiring a cost-benefit analysis, the Association offers pages of public policy arguments, all steeped in dense economic jargon. We need not consider these arguments, as we conclude the language of section 116365 is clear and unambiguous, and "cannot be construed" to require a cost-benefit analysis. (*American*

24

*Textile, supra,* 452 U.S. at p. 511.) We therefore reject the Association's argument that the Board failed to discharge a statutory duty to conduct a cost-benefit analysis.

### 4. Other Discernible Standards

The Association next argues the Board failed to apply any discernible standard for determining economic feasibility. We are not sure what the Association means. To the extent the Association means the Board failed to comply with the standard required by the statute, we disagree. As previously discussed, section 116365 required the Board to "consider the costs of compliance to public water systems, customers, and other affected parties with the proposed primary drinking water standard, including the cost per customer and aggregate cost of compliance, using best available technology." (§ 116365, subd. (b)(3).) The Association does not suggest the Board failed to consider any of these costs. Instead, the Association appears to suggest that the Board's consideration of costs was not guided by any discernible economic standard. But the Association does not say what economic standard should have applied, or explain why the Board was not free to conduct a feasibility analysis, or any other form of economic analysis that adequately accounted for the costs of compliance with the proposed MCL, as the Board's analysis indisputably did. The Association merely repeats the mantra that the Board should have conducted a cost-benefit analysis. As we have already established, no such analysis was required.

### B. Compliance with the Administrative Procedure Act

The Association argues the Board violated the Administrative Procedure Act by failing to consider the potential for adverse economic impacts on operators of nontransient noncommunity water systems. As previously discussed, the Board recognized that "a small number of the identified public water systems likely provide water solely to businesses, and that public water systems identified as community water systems often provide water to businesses." However, the Board did not specify how many nontransient noncommunity water systems would be affected by the proposed

regulation or analyze how they would be affected. The Association argues the omission constitutes a violation of Government Code sections 11346.3, subdivision (a), which requires that agencies "assess the potential for adverse economic impact on California business enterprises and individuals," and 11346.2, subdivision (b)(4)(B), which requires "description of reasonable alternatives to the regulation that would lessen any adverse impact on small business and the agency's reasons for rejecting those alternatives." We are not persuaded.

The Association argues the Board should have considered and discussed the fact that more than 110 nontransient noncommunity water systems would be affected by the proposed MCL.[13] But the record reveals that most of the affected water systems were not identified until after the MCL was adopted. At the time of the initial statement of reasons, and throughout the rulemaking process, the data available to the Board indicated that only 12 nontransient noncommunity water systems, including nine agricultural and food operations, would be affected by the proposed MCL.

The trial court found the Board's failure to consider the economic impact of the proposed MCL on nine agricultural and food operations was not a "substantial failure to comply" with the Administrative Procedure Act. (Gov. Code, § 11350, subd. (a); see *Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, 1073.) The Association does not challenge this finding. Instead, the Association argues the Board should have anticipated that other nontransient noncommunity water systems would be affected. The Association's argument fails on the record before us.

---

[13] Of this number, approximately 25 nontransient noncommunity water systems appear to be schools, which the Board was not required to consider under Government Code sections 11346.3, subdivision (a) or 11346.2, subdivision (b)(4)(B) of the Administrative Procedure Act.

Our Supreme Court has explained that an agency's assessment of the economic impact of a proposed regulation has three phases: "First, the agency makes an initial, provisional determination of whether the proposed rule will have a significant adverse economic impact on businesses. Second, during the public comment period, affected parties may comment on the agency's initial determination and supply additional information relevant to the issue. Third, when the agency issues its final decision and statement of reasons, it must respond to the public comments and either change its proposal in response to the comments or explain why it has not." (*Western States Petroleum Assn. v. Board of Equalization, supra,* 57 Cal.4th at p. 429.) An agency's initial determination of economic impact "need not exhaustively examine the subject or involve extensive data collection. The agency is required only to 'make an initial showing that there was some factual basis for [its] decision.' [Citation.] Moreover, inferences and projections that are ' "the product of logic and reason" ' may provide a valid basis for an initial determination of economic impact. [Citation.] And a regulation will not be invalidated simply because of disagreement over the strict accuracy of cost estimates on which the agency relied to support its initial determination." (*Ibid.*)

The Board's initial determination of the economic impact of the proposed MCL was based on then available data, which indicated that only nine agricultural and food operations would be affected. The Association argues the Board had an obligation to "ask the right questions" and "be sufficiently proactive" in anticipating that other nontransient noncommunity water systems would likely be affected, but the only authorities the Association offers are inapposite.[14] The Association does not offer any

---

[14] *Community Youth Athletic Center v. City of National City* (2013) 220 Cal.App.4th 1385 and *Ellena v. Department of Insurance* (2014) 230 Cal.App.4th 198, on which the Association relies, do not involve the Administrative Procedure Act and are therefore no help to the Association.

authority for the contention that the Board had an obligation to reject the data available at the time of the initial determination or seek additional information that might contradict that data.  Nor does the Association suggest that the Board acted unreasonably in relying on the available data, or ignored other information presented during the notice and comment period.  In the absence of any such authority or evidence, we conclude that the Association has failed to establish a violation of the Administrative Procedure Act.

## III.  DISPOSITION

The judgment is affirmed.  The Board shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

_____

RENNER, J.


We concur:


/S/

_____

RAYE, P. J.


/S/

_____

HULL, J.